Thank you very much, Your Honors. James Wagoner, appearing on behalf of Lexington. I would like to reserve approximately five minutes for the reply. Okay. I'll try and help you. Thank you. The two is the key number for today, I would like to emphasize, for two reasons. One, the Scottsdale policy the Court needs to appreciate covers two insurers, Mr. Lopez and NPS, National Public Safety. Mr. Lopez is only insured when he's using the vehicle. NPS is insured 24 hours a day because it's the named insurer. And when you consider, the other thing I think it's important to appreciate is that Scottsdale has the burden of proving that its policy does not apply. That is one of the elements of its cause of the first thing that the Court needs to do is follow the correct analytical methodology. It's very simple to look at the caption of the case and say this is a case between two insurance companies. It clearly is. There's no question about it. But I think that can be a slippery slope if you lapse into the question of asking ourselves, gee, which policy should apply. We think the correct analytical methodology is to look solely at the Scottsdale policy first because it's their burden of proving that the policy does not apply. And it's very important to consider the Scottsdale policy if it were the only policy available. And the reason for that is pretty clear. The California courts have made clear that when you're looking at insurance policies, you have to consider that they're the only policy available for the purpose of securing uniformity of decision. The fact that there are two insurance companies that are parties to the case doesn't change the analysis. Well, the only problem I'm having, I hear your argument. I have no quarrel with the analysis you're suggesting. But as I understand the Lexington Comprehensive General Liability Policy, it covers professional services that are rendered by NPS. And one of those services is to provide escorts, motorcycle escorts, for funeral processions. Does it not? It does, but not to automobile use. Well, without regard to autos, my question is, let's assume that Mr. Lopez was simply standing on foot in the middle of the intersection trying to stop oncoming traffic in order to clear the funeral procession. Wouldn't that be a covered professional service under the Lexington policy? Yes. If there's no motor... Say, for instance, he gets to the intersection, parks the motorcycle to the side, and tries to walk out against the red light and try to stop traffic with the presence of his helmet and uniform, would that be a professional service? Sure it would. Okay. But that's not what happened. Well, I understand that. But it's not as if the escort duties were totally divorced from the risk that Lexington wrote its policy to cover. The providing of escort services is part and parcel of the professional service that NPS renders to its clients. So I'm not sure it helps by saying that we focus only on the Scottsdale policy, because there happened to be a motorcycle in the vicinity. Let me see if I can help with that, Your Honor. I appreciate the Court asking that question. The Court will recall that the way the insuring language of the Lexington policy reads is we cover bodily injury or professional services. That's what it says. Take the word professional services out of there. Is it still going to cover bodily injury? Sure it is. That's what this is. If Mr. Lopez was riding his motorcycle and got into an accident while he's leading the funeral procession, there's no question that just because he's leading the funeral procession with 20 cars behind him, if he gets in an accident on that motorcycle and runs over a kid crossing the street, that's not going to be covered in a Lexington policy. The fact that he's in the course of professional services doesn't change that fact. The exclusion... You're saying there would be no coverage, even if there were no automobile policy, if he were involved in an accident leading the procession, then this Lexington policy wouldn't cover his injuries or the injuries to anybody that he hit. Mr. Wagner, Judge Gould, I have a question for you once you've answered Judge Tallman. I think I'm done, Your Honor. Thank you. Go ahead. Actually, I've got this... I have this question for both... I'm going to have it for both counsel, but it sort of gets to the heart of what's on my mind. So my question initially is are the use of Mr. Lopez's motorcycle, on the one hand, and Mr. Lopez's disregard of traffic signals when escorting the procession, on the other hand, are those concurrent causes for the accident? And if so, if they are, what is the implication on the insurance liability of both Scottsdale and Lexington? Thank you, Your Honor. In other words, what I'm trying to understand is why isn't there concurrent liability on both policies? And if so, what's the result? The case that we cited in our letter to the court about 30 days ago, Farmers v. I forget the name of the case, but a recent case in the California Court of Appeal, makes it clear that the concurrent cause doctrine only applies if there's two independent negligent acts. In response to your question, Your Honor, the use of the motorcycle and the disregard of traffic signals was the same act. We don't think it's any different. The concurrent cause, if you will, that was argued by Scottsdale was not the use of the motorcycle to stop the traffic. It was when Mr. Lopez dismounted the motorcycle and was standing a few feet away from it directing traffic. That was the separate concurrent cause. But the factual problem you're having, and I have to say I have some difficulty with the district court's analysis of the facts, suggests along the lines of Judge Gould's question that it was a combination of factors that the motorcycle itself, with its flashing amber and white strobe lights and the chirping of the air horn, was also being used in order to command the attention of motorists to stop. Plus, he had dismounted and was presumably using hand signals and the presence of his uniform and helmet in order to command the attention of traffic to stop. So why wouldn't that be, in response to Judge Gould's question, a concurrent cause of the accident? Both the use of the auto and negligence on the part of Lopez in the manner in which he was trying to secure the intersection. Because we contend those are not separate causes. It's all one intertwined course of conduct, using the motorcycle to both stop the traffic and protect Mr. Lopez when he's standing in the middle of the intersection. Well, it's to protect Lopez and to command the attention of the motorists. I mean, one of the inherent difficulties, as I think you all well know, of a police officer or somebody who looks like a police officer, trying to counterman the light hardware by giving conflicting signals produces a very odd situation for drivers. You don't know whether to honor the traffic signal or honor the direction of the traffic. The reason that they're all one cause is because if you read the California case law, it all says there must be separate and independent negligent acts. But let me respond back to His Honor's question. If there are two separate concurrent causes, Your Honor, the answer is both policies apply and then the Lexington policy is excess. Both by virtue of Insurance Code 11-580.9, which is controlling in California, and by virtue of the non-conflicting other insurance clauses. When I say non-conflicting, we all know that when other insurance clauses conflict with each other, if each of them says they're excess, those are conflicting clauses. Okay, so I understand that position, which is that if there's concurrent liability on both policies, that Lexington's position is the excess insurance clause says that it's the excess carrier and Scottsdale is primary. Correct. And there's, I guess, an intermediate appellate decision, national something, national insurance? National insurance. That may support that idea that you'd win on that, but wouldn't you still have had a decision that would have a duty to defend in the case? No, because there's no duty to defend if, in fact, there's primary insurance. In other words, if the Scottsdale policy applies, which it does, they conceded there's, well, Scottsdale covered the case and defended. And at a minimum, even the district court says that Scottsdale had a duty to defend. And if Scottsdale had a duty to defend, Scottsdale would have defended. And let me also address, if I could, there's really two reasons, and I said two is the key here. Two reasons why the Lexington policy is excess. The second one is the other insurance clauses, but the first is 11-580.9, and His Honor referred to the National American case, I think, versus INA, which is an intermediate, that's the egging case, throwing an egg out the side of the car. One of the things I would ask the court to consider very carefully in deciding whether 11-580.9 applies is look at 11-580.8. 11-580.8 was enacted in 1970 for the purpose of trying to resolve as much as possible conflicts and disputes between insurance companies. And so it's a remedial measure which should be interpreted liberally and broadly. And it says the word liability insurance. It doesn't say auto liability insurance in 11-580.9-D, it says liability insurance. In contrast to the language used in 11-580.9-A, which says auto liability insurance. So when the legislature used the word liability insurance in 11-580.9, it must be presumed to have known what it was talking about. And liability insurance includes auto insurance. And so when 11-580.9-D says, well there's two or more policies, liability policies, covering the same vehicle, it doesn't say auto liability, it says liability, then the one that describes or rates the vehicle as primary is considered primary. And the reason for that is to, if you look back to the 1960s, the courts were flooded with cases between insurance companies fighting over whose policy was primary and whose policy was excess. And as a remedial measure, 11-580.8 and 11-580.9 were passed. And to give the legislature's enactment meaning, I think the legislature should read the exact language, and the exact language says liability insurance, not auto liability insurance. And for that reason, we think that National American case was correct. And I would note that it hasn't been... I'm sorry, Your Honor. What do we do with... I think there's a factual issue in the case with regard to Mr. Lopez's decision to enter the intersection against a red signal light. I looked in the vehicle code, and I could find no provision that gives an escort to a motor funeral procession the right to disobey traffic signals. You're absolutely correct. If there was one, it would have been found by the parties in this case. I would think so. There is no code section. The only one that was cited, I think it was 21-87, just makes it... Peace officer. Yeah, if it's a peace officer and you don't obey his command, then that's an infraction or maybe even a misdemeanor. But my question is, why doesn't that trigger Lexington's CGL policy if he was negligent in his decision to proceed into the intersection against the red traffic signal? Because he was on a motorcycle when he did it. And when he's on a motorcycle, just deciding to do it doesn't stop traffic. Physically doing it is what stops traffic. And I think the best answer that I can give, Your Honor, is to ask the court to just assume that the Mitsubishi wasn't there, and assume Mr. Phillips came riding right along and smashed into the NPS motorcycle that had been parked there. Mr. Lopez wasn't on. He was over at the 7-Eleven checking on his wife and the kids. There's no question. Again, that's why I emphasize that we appreciate that NPS isn't insured. NPS, the company that's putting on the funeral procession, is using the motorcycle. It uses four motorcycles. It does it in kind of a succession where you're on top and all this kind of stuff. I remember I'll, forgive me, but I remember talking to my wife about this case, graduated in third year class in law school, a lot smarter than me. I'm talking about this case and she goes, Jim, it's a funeral procession. Funeral processions are inherently an auto-related activity and have been since the 1930s when cars took over for horses and buggies. A funeral procession is inherently an auto-related activity. The motorcycle at all times was used to block traffic. Mr. Lopez might not have been standing or sitting on it at all times, but was NPS, let's ask ourselves the question, was NPS using that motorcycle at the time that Mr. Phillips crashed into the Mitsubishi? Sure it was. It was using the motorcycle to block the intersection. That's what NPS was doing. So your position is that the Lexington professional liability policy doesn't cover whatever the conduct. Funeral procession escorts. It doesn't cover it if it's an auto-related bodily injury or professional liability. There has to be an act that causes liability. I understand the act, but I guess if a business goes out and gets a comprehensive general liability policy and one of the services that the business provides is escorts for funeral processions, are you saying that that whole activity is excluded from the CGL policy? Only when they're on a motorcycle. What if they're at the cemetery and they're trying to help the widow get into the limousine and she trips and falls? That has nothing to do with the motorcycle, but it covers her professional liability in assisting that funeral procession. Then why doesn't it cover my question about his negligence in the manner in which he implemented company policy on escorting funeral processions? In other words, I don't know whether there's a company policy. I assume if there were, you would have cited it. He did it exactly according to, we took the deposition of the president of NPS, Mr. Frost. Who was also on another motorcycle, was he not? I believe he was in the back. He said that Mr. Lopez did everything exactly as NPS wanted him to do it. I'm not trying to avoid your question. Let me get back to it. If the question is the abstract, his negligent decision to decide to stop the traffic. Let's say he decided to do that that night when he was sleeping and he wakes up and says, I think I'm going to stop that traffic at Sanborn and Jefferson tomorrow. The fact that he's not on this motorcycle when he makes the decision doesn't make that a professional liability risk. What you have to do is look at the act which causes liability. His act was the execution of that decision. Because if he just makes the decision and changes his mind, there's no liability and there's no accident. What causes the liability is his fulfillment of that decision, which is an act of using the vehicle. And he parks it right in the middle of the intersection. And there'd be no doubt that if he parked that motorcycle right in the middle of the intersection, the Mitsubishi wasn't there, and Mr. Phillips came crashing through, hits the motorcycle and has the same fatal injuries, everyone would say NPS is liable because NPS parked the motorcycle in the middle of the intersection. It is analytically no different in this case, the fact that the Mitsubishi was there and Mr. Phillips hit the Mitsubishi. It's the same thing because the cause, in fact, of the Mitsubishi being stopped was the motorcycle. Okay, I think we have your point. I do want to, oh, Judge Wolk, do you have a question? This is related to Judge Tallman's question. Let's assume that he stopped the motorcycle pursuant to an express policy of the company. And it sounds like that's true based on the testimony you related. There's the company, there's the board, and they've made a resolution where the CEO has set out a guideline that says when you're handling a funeral procession, we want you to drive into an intersection, even if the light's red, and stop the traffic on the other side, even if the light's green. Now, is that resolution by the board or policy of the CEO, is that a negligent act that causes the accident when all the officer does is implement that? It's part of the same course of conduct. You can have the board of directors decide it, they can ratify it each year, and all of it is all the same course of conduct. If you look at the auto cases and the cases involving auto exclusions, what they say is you look to the act which actually causes the injury. There's always antecedent decisions. The decision to get in a car. Someone can be at home and they can decide, I'm going to drive to the car. That decision at home doesn't mean it's covered under their homeowner's policy, even though they made the decision when they were at home. Whether you call this professional or not, it's a security guard service, people can argue about whether that's professional or not, but the fact is, that's the conduct. It's the liability. It's when you're out there transacting your business, performing your service, that's when you incur the liability. There's no question that this occurred within the course and scope of his employment? No question about it. But I do think that sometimes we can lose focus if we keep talking about Mr. Lopez. If we talk about NPS and assume Mr. Lopez was at the 7-Eleven, calling his wife, and the same exact accident occurs, even with the Mitsubishi there, NPS parked the vehicle in the intersection, and NPS, forget about whether Lopez was using the vehicle at the time or not, NPS parked it. There's no question. Say for instance, one of the judges would have parked their car in the middle of the street out here in front of the courthouse, came in here and two hours later somebody smashed into that car, and we're sitting here and say, you know, I think I'm going to leave my car there for a couple more hours. And so you make that decision when you're in your chambers. That doesn't mean that when you park your vehicle out there and two hours later somebody hits it, it's not auto-related. It's an auto-related act to park your car somewhere in the middle of the street. You're starting to repeat yourself, and you're out of time. I am out of time. My apologies. But we're going to let Mr. Claiborne get a shot at it. Yeah, I will. I'll let him. You're welcome. Thank you. Let's hear from Scottsdale. Good morning. And I've had the benefit of hearing the judges' questions, and I'm certainly ready to respond to those. Judge Gould asked the question about whether this did not think that this case involved concurrent causes. And this is the one area of the case where counsel and I agree. There was only one cause of this injury, and that was the failure to properly secure the intersection. And the way they failed to do it was it would have been better if you wait for the oncoming traffic to be stopped at a red, then you go out into the middle of the intersection. And when the cars are already stopped, you allow the procession to go through. And that would have been the non-negligent way of doing it. But suppose Lopez had waited until the light was green before he entered the intersection. Then he stopped his motorcycle, dismounted, and using the benefit of the red light to the perpendicular traffic, held up his hand so that they would indeed honor both his signal and the red signal. But Phillips had come screaming along, and his motorcycle wasn't paying attention to the red light, and laid the bike down and crashed. Wouldn't the Scottsdale policy be implicated in the defense of that claim? No, the Scottsdale policy would be implicated for a typical auto accident. And I agree, you could have a typical auto accident during the funeral procession if the Lopez motorcycle, if Mr. Lopez wasn't looking and he had simply rear-ended the car in front of him, that would be an auto risk. The reason this isn't an auto risk at all, not a directing traffic is not an auto risk. When I drove to the court this morning, if I got into an accident, it's an auto risk. If I got out and tried to direct traffic, or even tried to direct traffic using my car, that's not an auto risk. But your car's not painted black and white with flashing strobe lights to look like a police motorcycle. I mean, the fact that he had the motorcycle in the intersection with emergency equipment is not the right word, because it's not an authorized emergency vehicle under the vehicle code. But the fact that he had the warning lights operating, he was clearly using the motorcycle along with his uniform and official appearance to try and take control of the intersection, was he not? Well, he was on the motorcycle, and then he got off. But this is no different from the exact issue back in 1978. And in that case, the officer never even got out of his car. According to the Supreme Court of Louisiana, the negligence in that case was the officer shouldn't have just led the procession through the light. He should have used his car to block the oncoming traffic. But that happened here. That's what the motorcycle was doing. It was blocking the oncoming lane of traffic with its lights activated. Even if that's true, according to the Louisiana case, they're saying if you use your car, as you should have, to block traffic, that's still not an auto risk, because he's not using his car as a car. He's just using it to secure the intersection. I think the problem I'm having with your argument is this is not just any car. This is a car that, for all intents and purposes, is supposed to look like a police car. And police cars are equipped with special lighting that I can't have on my car, because the car and the lights are used to make drivers do things that they wouldn't otherwise have to do under the vehicle code. And that's what he was using the motorcycle for. In the Louisiana case, it was a police car. Can I ask you about the California case, the Partridge case, in which the Supreme Court of California said that when used in a coverage or insurance clause of an insurance policy, the language arising out of auto use affords coverage for injuries bearing almost any causal relation with the vehicle? In Partridge, the court found... Go ahead. I'm sorry. The court found that the use of the auto was one of two proximate causes. That was a true concurrent cause case. In Partridge, there were two proximate causes, not minimal causes or even substantial factors, two full-on proximate causes. One was filing down a hair trigger, and the other was negligent driving. So... Well, why isn't that true here, in a sense? He's clearly using the motorcycle, which is an auto, for the purpose of your policy. He was using... And it's operating to stop the traffic, and the stopping of the traffic was a cause of this accident. And maybe he was also negligent, because he told him to go stop, regardless of the light signal. He... The difference is between an auto risk, where you drive unsafely. He wasn't driving unsafely. He was using the motorcycle to secure the intersection a little bit at first, and then he got off the motorcycle. And I just want to emphasize the point I'm making, because I can see there's a difference of opinion here, and that is... It's kind of an uphill argument, it sounds to me, based on the questions you're getting, because we're all kind of struggling with the notion that the motorcycle had nothing to do with providing escort services to the funeral procession. And it seems to me that the motorcycle was, frankly, maybe more important than Lopez, in the sense that you can't provide escort services to a motorcycle profession without the use of these motorcycles. I mean, these employees can't run along the side like Olympic runners and secure the intersection. So why isn't this a use of the vehicle, which is included in the schedule as an endorsement of covered auto on your policy? Because the purpose of the auto coverage is to cover unsafe driving. As the Supreme Court of Louisiana said, the auto policy, the purpose of the auto policy isn't to cover professional negligence in securing an intersection. An intersection is typically secured and can be secured without the use of an auto. Counsel, Judge Gould, if I could interject a little bit here. You know, I understand your argument. I understand your argument is that the sole cause, there's one cause of the accident, it's Lexington's negligence. And Lexington's position is there's one cause of the accident. It's the motorcycle. And each of you were arguing, as good advocates as you should, that my client's policy has no exposure. But just so we cover the issue, assuming that the panel were to disagree and think that there were concurrent causes creating liability on each policy, which might be possible under the theory that each policy has to be looked at standing alone and giving the insured every break if there's ambiguity. If that were the case, I really want to hear Scott Steele's position on the significance for liability in the case. That is, does Lexington still win anyway, which it argued in response to my question, based on the other insurance clause saying that you would be the primary and they would be excess? No. If we conclude there's liability on both policies, do you agree that your client's policy is the primary? No, I don't agree with that. If there were two causes, then each policy would cover its own separate proximate cause, like in the Partridge case. So there's no overlapping coverage here. 11.580.9d applies for two policies that will apply to the same motor vehicle that are both covering unsafe driving. That has no application here whatsoever. Similarly, their other insurance clause has no application because they're simply two entirely separate and distinct risks and no overlap at all between the policies. What the court's suggesting is factually there may be two reasons, and both counsel have disagreed with that, actually. But if it were true that there were two different proximate causes of this loss, as in the Partridge case, then each policy would apply entirely separately and there's no overlapping coverage, so it would be split equitably, split 50-50. Let me ask you a follow-up question on that. I realize that you and your colleague on the other side know a lot more about insurance law than any judge on the panel does, most likely. But still, let's assume that the judges struggle through, and it ends up that the three judges disagree with the two advocates, that there's only one policy and one exposure here, and conclude that there are concurrent liabilities on both policies. So if we do that, as I understand it, Mr. Wagner's position was that Lexington would still aid away and be entitled to get a reversal because of excess insurance. And your clause and your position is that no, that's wrong, that that clause in the statute have no application. Do I have that right? You do, and I would cite the court to another Scottsdale case where I was counsel, that's been cited in the brief, Scottsdale Insurance Company v. State Farm. And that case addressed this completely, or this exact point, and said that 11580.9d did not apply when one policy was an auto policy and the other was a CGL policy because they don't apply to the same motor vehicle. The CGL policy, the Lexington policy simply does not apply, it's not considered to apply to a motor vehicle. It's a CGL policy with an auto exclusion. Does that case cover not only whether the statute applies, but the significance of the policy language in the Lexington policy? No, I don't think that case addressed the policy language, but on the policy language I would say that, again, if you really talk about concurring causes, you're not talking about overlapping coverage. When you look at an other insurance clause, you're looking at two policies covering the same thing. These two policies don't cover the same thing. They have no overlap at all. I'm not sure it's quite as clear, given the nature of the service that NPS is supplying here. I mean, I explored with Mr. Wagner and I think Judge Gould asked some questions about whether or not this was all done in pursuance of company policy, and the policy is to provide escort services to funeral processions, and this accident occurred in the course and scope of providing escort services. So it's frankly closer than the situation in Partridge where the hair trigger was filed down, it seems to me. Well, in Partridge there were two completely independent acts of negligence. And I'm suggesting that these facts are not quite so completely independent. I see them as interrelated. Well, I understand what your Honor is saying is that the motorcycle, may have been used to help secure the intersection, but it's still, there's only one act of negligence. And the securing of the intersection was in furtherance of company policy. Right. Apparently had been given to Lopez from the owner of the company. Right, but there's, the way the negligence claim is framed is that there's a safe way and an unsafe way to secure the intersection, and they performed it in an unsafe way. It's very different from Partridge where it's very unsafe to file down a trigger on a pistol, and it's also unsafe to drive recklessly. But this gets back to the notion of why we exempt funeral processions from traffic lights generally. I mean, that's inherently an unsafe thing to do. And yet we have this tradition, apparently it's a longstanding tradition, to do that. I mean, I could see, and I'm sure this happens all the time in a long funeral procession, where the light cycles, and just like your light is coming on, and it turns to red while the procession has not yet completely cleared the intersection. And yet the cars are signaled through by Lopez or whoever's directing the traffic against a red traffic signal. Right, that's the purpose of conducting the funeral procession, is because the procession can't get all the way through the light, and they want to keep it together to go from the funeral home to the cemetery. So that is the purpose of what was being done. I do want to mention something that Your Honor asked Mr. Wagoner, and that is my understanding is that this was entirely lawful, that NPS does have a lawful business. They are permitted by the police to conduct these funeral processions. They weren't cited either. But they did enter the intersection against the red light, did they not? Yes, but they were permitted. Even though he didn't get a ticket for it, and I did some independent research too, and like Mr. Wagoner, I can't find anything in the vehicle code that says they're permitted to do that, although by custom we allow them, and we don't cite them for it when they do it. But now we have a traffic accident as a result of having done that. You wouldn't find it in the vehicle code. It's like getting a permit for many types of things that aren't legal without a permit. Well, there's that San Francisco case where they tried to countermand the vehicle code 21458A by municipal ordinance, and the court said you can't do that. That's state law preempt. I think as Your Honor alluded to, this is a longstanding course of conduct where communities and the police do permit these funeral processions. But that doesn't mean it's not negligent. Even though we may be negligent all the time, it doesn't necessarily mean it's not negligent. Well, the negligence would have to be in the manner in which you conduct the procession. Well, that gets back to Judge Gould's question of why wasn't this being done in pursuance of official company policy. I would agree it is. I mean, that's their business, and they felt they were doing it properly. That doesn't mean they weren't. The theory of the case, and the case was settled, and I do want to mention one point. Lexington denied a defense with no investigation. These facts that we're talking about here were only developed later. Lexington's not allowed to rely on these facts. I mean, there is. I represent an insurance company. I've been an insurance lawyer my entire career. There is a penalty for denying a defense out of the box with no investigation. You can't develop the facts later in hindsight and say, oh, I was really right for facts that I was totally unaware of. They wouldn't have been given notice by the complaint in the underlying case. The complaint in the underlying case wouldn't have given them the notice that you're talking about. Well, all they had to do was talk to the insured, which is typical. You get a complaint. There's a duty to investigate it. There's a duty to look at extrinsic facts. And the complaint didn't explain how the accident occurred. It said there was an auto accident. It didn't say that NPS's vehicle had been involved in an auto accident. And the insurance company was required to get on the phone, as simple as that, and find out how this happened. And then, I mean, they know they cover professional liability. It turns out this was a professional liability. Yeah, but to get back to that, can I ask you about, they sort of have assumed in this contract, they say that it excludes liability arising out of the ownership, et cetera. But then they have another clause that says something to the effect that, if it should happen, that the loss arises out of the use of an auto, and they're somehow found responsible that they have to provide coverage. It's only to the extent not subject to the auto exclusion. What does that mean? Well, that's a good question. What do they get? The way that can come into play, like I said, I've given reasons why I think that the other insurance clause has no application here at all, when there's two clauses. But the way that could come into play, the auto policies and auto exclusions, they're not absolute. They refer to autos you own or you use, et cetera. You can be liable without ever owning or using an auto, in which case the CGL policy could, in some cases, be excess when it's strictly an auto risk. But this was not strictly an auto risk, even if the court feels that this was. Well, let's accept that it arose out of the use of an automobile and the professional negligence of the driver. And why don't they get the benefit of what they seem to have, a circumstance that they seem to have assumed, that notwithstanding the exclusion arising out of the use of a motor vehicle, that somehow they might still be held liable. And in that case, they're secondary. Well, the only reason it wouldn't have arisen out of the use of an auto was because there was a professional liability risk that isn't covered under the Scottsdale policy. Well, that gets back to the... Well, that gets back to concurrent clauses. Well, no, I mean, I'm saying the distinction is there's concurrent clauses. Can I raise a question sort of on the side? And I realize your time's up, but probably let me ask this question. When I was in practice, I had the impression that when insurance companies had disputes among themselves, that there existed some significantly erudite panels or tools available for working out the problems by mediation or arbitration or some other means. And we also have very sophisticated mediators working for the circuit.  But what I wondered was, and this is not just to try to avoid thinking further about a hard question, whether there was any chance that your client and Lexington would want us to defer submission for a week or two weeks to let you consider if you wanted to use the court, the court's mediators. I understand that there was some discussion with that group early on, and they decided it wouldn't be fruitful. But, you know, things might look different in light of your thoughts in response to the questions you've heard from all three of us. We are always amenable to mediation. We did conduct one mediation in the case, and we've had some settlement discussions. Well, let me just echo, because I think that's an excellent suggestion. You've heard what our concerns are. I think you kind of have a feel for where we're coming from, and to the extent that that makes a difference in how you view the prospects of resolving this by settlement rather than waiting for us to tell you how you're going to resolve it, which, in my experience, is usually not as well-received as when the parties work it out amongst themselves. I think what Judge Gould has suggested is a good idea. Mr. Wagner, would you be willing to take another run at mediation? No problem. I won't go into the scope of the discussion here. Sure. No, I'm not asking you to disclose. My client is not undisclosed. Okay. Well, I mean, you guys settle cases all the time, and hopefully now that you've heard the concerns of the panel, maybe you can go back to your clients and say, look, we need to take another run at this. I think the election has to vote two weeks before. Two weeks would give you enough time? That's fine for the election. Okay. That's how it has to be, according to Mr. Utero. Yeah. Does that sound okay, Mr. Utero? Sure, that would be fine. All right. We can do that. And I don't want to deprive Mr. Claiborne of his time at the podium. For the benefit of Judge Gould, Mr. Claiborne needs an oral argument in front of the court so that he can get a notch in his belt for admission or certification as an appellate specialist. So if you'll indulge. Let's give him the opportunity, and also it's helpful for us the more we can hear. All right. Thank you, Your Honor. Thank you all. Mr. Claiborne, I'll give you five minutes on your cross appeal. Thank you, Your Honors, for your indulgence. Michael Claiborne on behalf of Lexington Insurance Company. I just wanted to speak briefly on the cross appeal, which wasn't discussed much today so far. But Scottsdale contends that the district court erred in its holding that Scottsdale owed a duty to defend in the underlying action. Scottsdale's cross appeal failed for three reasons. First, the pleadings in the underlying action alleged facts that are broad enough to trigger a duty to defend on Scottsdale's part. Second, the district court did not err by failing to consider the police report to the extent that it did in its order. That is proffered by Scottsdale. And third, the district court's error in quoting or misquoting, I apologize, the underlying pleadings, did not require reversal as it didn't taint the district court's reasoning. Before I get into the substance of the argument, I'd like to point out two legal principles that should guide the court on the cross appeal. First, this is a de novo review. On summary judgment, the court should apply the record and determine the correct legal result without worrying about whether the reasoning of the district court was correct. And second, I point out that the duty to defend while not unlimited is extremely broad and that the court should look to the allegations of the pleadings rather than the actual facts that came out during this case and determine whether that triggered a duty to defend under Scottsdale's policy. Now, moving to the allegations of the underlying pleadings, both the first initial complaint and the first amended complaint in the underlying action alleged that NPS and Lopez negligently failed to control, operate, or drive their vehicle. There was no allegation that Lopez dismounted from the NPS motorcycle in the middle of the intersection like we now know happened. Based on those facts, it's clear that there's alleged auto-related conduct. The negligent driving, operating, or control of the NPS vehicle would be covered or at least potentially covered under the Scottsdale policy. I would also point out that although there's some disagreement on this, there was no reservation of rights issued by Scottsdale when it defended NPS and Lopez in the underlying action. Based on the allegations and the lack of reservation and the fact that Scottsdale defended NPS and at the time it appears considered that there was actually potential for coverage, we would argue that there was in fact such a potential and it triggered the duty to defend. So is your position, based on the questions that we asked both counsel earlier, that Lexington had no duty to defend the claim even on our broader concern that there may well have been concurring causes based on the company's policy in addition to the use of the motorcycle? Correct, Your Honor. And what we would point out is that both the initial complaint and the underlying action and the first amending complaint neither mention the fact that Lopez ever dismounted from the motorcycle. And that fact is one that Scottsdale has pointed to throughout this litigation as a key point as to why this course of conduct wasn't auto-related. What about the argument that you still have a duty to do more than rely on the complaint? There's case law in California that states that the duty to investigate is fulfilled by an insurer when the insurer looks at the complaint and compares it to the policy. That's all that's required of insurers in California to investigate. Mr. Claiborne, help me with paragraph 16 of I guess they're the uncontested stipulated facts. I believe offered by plaintiffs. I'm looking at ER 318, and I'll just read it to you. It says, Honor, about December 29, 2009, defendants were negligent in, among other things, the method and manner in which they proceeded with a funeral procession. Correct. And we would point out the name of the case escapes me right now, but there are several cases in California that state that a complaint should be read as a whole when you're determining whether there's a duty to defend. And that broad allegation that there was negligence in operating or proceeding with a funeral procession does not conflict with and should be read together with the allegation that Lopez negligently rode, drove, or controlled and operated a motorcycle and that that caused the accident. But why doesn't that give rise to when they challenge the method and manner in which they proceeded with the procession, why doesn't that challenge the company's policy about how they go about providing escort services? I believe I'll echo Mr. Wagner's responses to some earlier questions when I say that just because there's a professional service rendered does not mean that there's coverage under the Lexington policy. The Lexington policy's auto exclusion, which is displayed for the court, mentions bodily injury, property damage, or professional liability that arises out of the ownership or use of an auto. And because of that provision, even if there are professional services rendered, if the accident arose out of the use of the auto, the exclusion applies and Lexington doesn't provide coverage. But taking your point that the duty to defend is broader than the duty to indemnify, why shouldn't I read the word method broadly to encompass corporate policy as opposed to the specific use of the Lopez motorcycle on December the 29th? I believe you should read that broadly, but you should read it in the context of the factual allegations that Lopez failed to properly operate his motorcycle and that's what caused the accident. When determining a duty to defend, the court doesn't look at how the cause of action is pled. Skilled plaintiffs are going to throw just about anything into a complaint and that shouldn't control coverage. So there are cases that say that you read the complaint as a whole, you don't look at the specific manner in which a cause of action is alleged, but rather the factual allegations as a whole when you're determining coverage and the duty to defend. Okay, you're about two minutes over and I do want to give Mr. Utero a chance to respond. Thank you, Aaron. Thank you. Yeah, in looking at the complaint, and of course there was also a First Amendment complaint that added very explicitly more facts, but even the original complaint in paragraph 16 talked about the method in which the funeral procession was conducted and that does trigger a duty to find out how this accident occurred. And because they failed to do that, they're on the hook not only to defend, but the penalty for doing that is you're on the hook to indemnify. You're not, as I said, you're not allowed to come into court later and say, well, now we know that the motorcycle chirped its horn and now we know what the motorcycle looked like. That's not, you can't, I mean this is exactly what they're doing here. Let me just ask you, the chronology, did Lexington deny coverage before they got a copy of the Riverside County Sheriff's investigation report? Lexington never asked for a copy of it. It never received, so far as I know, never received it until this case, the case brought by Scottsdale. So I guess the answer to my question is they didn't have it at the time they denied. Correct. They stipulated they didn't have it. That actually was in the stipulated facts that were presented to Judge Phillips that the only investigation, if you want to use that term, that they did was compare the complaint to the Lexington policy. And so, you know, now we've had this whole discussion about the specific facts, which actually isn't prohibited, actually is not permitted to be done under California law. Otherwise, carriers can do what they did, and that is, I mean they're lucky that Scottsdale stepped forward. If Scottsdale hadn't stepped forward, no one would have defended the insured. Then they would have been, under your view, liable for failing to having defended, at the very least. But what does that have to do with the dispute between the two of you? Well, it's the same principles. In other words, the same principles apply, whether there's another carrier or not, in terms of your duty to investigate and your right to use facts you didn't know in hindsight. Thank you. I have nothing further. Okay. Mr. Wagner. Thank you, Your Honor. I'm going to try to run through this in a very disorganized fashion. First, Mr. Claiborne is correct. There is case law that says the insurer's duty to investigate can be satisfied by reviewing the complaint. My recollection is the case is called Barrico West v. Industrial. I believe it's about 110 Calab Fourth. I can get that citation if the court needs it, but I'm confident there are cases that say the insurer's duty to investigate is satisfied by reviewing the complaint, and that's what was done. Mr. Uter made a comment that the Scottsdale policy covers, quote, unsafe driving. But why isn't that enough? Why isn't paragraph 16 enough to trigger the duty to defend under the? If that was the only thing the complaint said, you'd be right. But the fact is you read the complaint as a whole, and there's a lot of it. In other words, what was the method that was wrong that resulted in the accident? The method that was wrong that resulted in the accident was the use of the vehicle. And so you have to read the complaint as a whole. Well, the use of the vehicle or the implementation of company policy on how we escort funeral processions? By using motorcycles to stop traffic that have green lights. Just completing the sentence, we use motorcycles to stop traffic that has the green lights so we can let the deceased in his or her last venture on this earth have the respect of everybody and let them go through. And we hope that happens to us as well. I'm sorry, but it's sort of the last ride. And I do think that the complaint makes it clear that this was a funeral procession, an inherently auto-related activity. The two causes issue with the court seems to be somewhat focused on that's exactly why insurance companies have other insurance clauses. Of course they write these policies to be mutually exclusive, but once in a while they're not. And when they're not, what you do to try to stay out of court and have things resolved between claims professionals who see these things all the time is you look to the other insurance clause. That's what it's there for. Because if the court concludes this is a concurrent cause case, which some of the remarks suggest, that's fine. One of the causes is clearly a right to the use of an auto. And the other insurance clause in the Lexington policy says if the exclusion doesn't apply, but it arrives out of the use of an auto, then the Lexington policy is excess. That's the whole reason why you try to avoid overlapping coverage between GL policies and auto policies. This isn't the first case where a GL and auto policy have kind of come close to each other in the history of insurance jurisprudence. It happens all the time. And how do you resolve it? You look to the other insurance clause. That's what it's for. The reference to the Scottsdale v. State Farm case, I have the case right here. I believe Mr. Uter is incorrect. What that case does is it cites 11.580.9D, says it doesn't apply. It cites a case called Hartford v. Sequoia, which was my case, 211 Calab III, and it said it doesn't apply to umbrella policies. That's what the case said. By umbrella policy, you mean a true excess clause. A true excess, correct. The reference that you can't use evidence that was not introduced, I mentioned this to Mr. Uter before the hearing. There was a case that, again, this was my case, came down about a month ago, and the only reason I didn't cite it previously is we were petitioning for rehearing on our own case, and the rehearing was denied yesterday. It's a case called National Union v. Tokyo Marine, 233 Calab IV, 1348. What the case holds is in the subsequent coverage case, you're not bound for indemnity purposes by the evidence that was involved in the underlying case. That was a case where we tried to get an expert that said something different than what the plaintiff's expert said. The court says, fine, you can do that indemnity case. Everything's wide open. One of the things I think is pretty evident, and the court has pointed this out, as advocates, we both contend our client is right as a matter of law. If, in fact, the court says you're terrific advocates, but you're not judges, and the answer is it's not as a matter of law either way, then the question is it's a question of fact. It's a question of fact that needs to be remanded. The questions of fact that I thought of that the court could consider, how close was Lopez to the motorcycle? Why did the Mitsubishi stop? We take the deposition of the driver. We all think we know why it stopped. Why did the Mitsubishi remain stopped? Did the motorcycle actually enable Lopez to safely stand in the intersection? And what is the effect of Scottsdale's admission of coverage? These are all questions of fact that if we do have to remand the case, I think the court should consider that as one of the options. Didn't you cross-move for a summary judgment? We both thought that— Now you're telling us there are contested issues of material fact that should have defeated summary judgment? No, we said it should be in our favor or in the alternative question of fact. We clearly argued that it was in the alternative, and that's still the position we've taken in our brief. Mr. Wagner, I've been very generous with the time, but I think we're done. I think you're done. Your Honor, thank you very much for your time, and I thank you on behalf of Mr. Claiborne for the opportunity. Thank you all. We all have to—there will be some replacements. We'll be in that funeral procession some day as well. Mr. Claiborne, I well remember what it was like to stand on that side of the podium, so you're more than welcome. The case just argued is submitted, and what we'll do is we'll enter an order vacating submission for two weeks to give you an opportunity if you report back to the court in writing whether you do wish to pursue mediation, then we can enter a further order at that time. So it'll be stayed? For two weeks to give you an opportunity to talk with your clients and then talk to the court's mediator about scheduling a mediation session, and if you're going to go down that path, send us a letter, tell us that that's what you're doing, and we'll delay any further decision on the case pending the outcome of the mediation efforts. Thank you very much for your time. Thank you all.
judges: Korman, Gould, Tallman